IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION


PAULETTE ROBINSON                                                    PLAINTIFF


v.                              NO. 2:18-cv-00149 PSH


NANCY A. BERRYHILL, Acting Commissioner                   DEFENDANT
of the Social Security Administration


<u>MEMORANDUM OPINION AND ORDER</u>


     Plaintiff Paulette Robinson ("Robinson") began this case by filing a complaint

pursuant to 42 U.S.C. 405(g). In the complaint, Robinson challenged the final decision

of the Acting Commissioner of the Social Security Administration ("Commissioner"), a

decision based upon the findings of an Administrative Law Judge ("ALJ").

     Robinson maintains that the ALJ's findings are not supported by substantial

evidence on the record as a whole.[1] Robinson so maintains for the following reasons:


> ... (1) the ALJ erred by failing to fully and fairly develop the record; (2)
> the ALJ erred in evaluating the consistency of ... Robinson's allegations
> of severely limiting foot pain and impairments; (3) the ALJ erred in
> considering and weighing the medical evidence; (4) the ALJ erred in the
> Residual Functional Capacity assessment; and, as a result, (5) the ALJ
> failed to elicit vocational evidence showing ... Robinson could perform
> jobs available in the national economy.


<u>See</u> Docket Entry 10 at CM/ECF 2.

---

[1]     The question for the Court is whether the ALJ's findings are supported by substantial evidence
on the record as a whole. "Substantial evidence means less than a preponderance but enough that a
reasonable person would find it adequate to support the decision." <u>See</u> <u>Boettcher v. Astrue</u>, 652 F.3d
860, 863 (8th Cir. 2011).

Robinson summarized the testimonial, medical, and documentary evidence in the record, and the Commissioner did not challenge the summary or otherwise place it in dispute. The summary will not be reproduced, except to note several matters germane to the issues raised in the parties' briefs.

Robinson was born on August 23, 1964, and was fifty years old at the time she became unable to work on July 24, 2015. She filed her applications for disability insurance benefits and supplemental security income payments on September 20, 2016, and alleged that she was unable to work as a result of, _inter alia_, osteoarthritis in her spine and knees and an impairment in her right foot.

The record reflects that during the period between February 13, 2014, and August 21, 2017, Robinson sought care at the Wynne Medical Clinic and was seen there primarily by Dr. Mark Bradshaw, M.D. ("Bradshaw") and Dr. James Cathey, M.D. ("Cathey"). _See_ Transcript at 734-851, 870-888. Robinson was seen for a number of complaints, the most compelling of which appear to have been her low back pain and the pain in her lower extremities. She represents, and the Court accepts, that "[p]hysical examinations consistently showed lower leg and foot swelling, foot pain (primarily along the right distal first metatarsal), severe left knee pain, a limp, and low back pain radiating into the left lower extremity." _See_ Docket Entry 10 at CM/ECF 5 [citing Transcript at 746, 748, 756, 758, 787]. An MRI of her lumbar spine performed on December 22, 2015, produced unremarkable results. _See_ Transcript at 662-663. She was prescribed medication for her pain, medication that included tramadol and hydrocodone. On at least one occasion, Bradshaw gave Robinson an injection in her left knee joint to help relieve her pain. _See_ Transcript at 751.

During the period Robinson was being seen at the Wynne Medical Clinic, she also sought emergency room care for her complaints of pain in her back and lower extremities. See Transcript at 406-410 (05/27/2015 presentation for complaints of severe pain in right foot); 375-379, 402 (07/18/2015 presentation for complaints of mild to moderate pain in her right big toe); 355-365, 556 (08/15/2015 presentation for complaints that included mild back pain); 588-591 (09/04/2016 presentation for complaints of moderate lumbar pain); 864-868 (02/18/2017 presentation for complaints of mild low back pain).[2] She was typically prescribed medication for her pain and instructed to follow up with her primary care physicians.

Robinson also sought care for depression and anxiety during the period between February 13, 2014, and August 21, 2017. For instance, Robinson was seen by Bradshaw on May 8, 2015, and his progress note reflects the following:

> [Robinson] to be evaluated for depressive disorder not elsewhere classified. Visit today is because of worsening symptoms. The diagnosis of depression was made 10 plus years ago. This episode of depression has been present for the past year. Currently not on any antidepressants. Current affective symptoms include **insomnia, crying spells and sadness**. The symptoms as constant and overwhelming. Presently, … ROBINSON admits to fleeting thoughts of suicide (she denies a suicide plan and is able to contract with me). Psychiatric history is significant for prior depressive episodes (one time previously) and prior suicide attempt (2004, OD attempt). She is moving to a new apartment and is told she must have a doctors note to keep her dog in new apartment. She is more depressed due to fear of losing her dog.

See Transcript at 754 [emphasis in original]. Bradshaw prescribed Zoloft and wrote Robinson a note so that she could reside with her dog.

---

[2]    Robinson also sought emergency room care for other complaints, but the complaints are not relevant to the issues at bar.

On November 21, 2015, Robinson sought emergency room care for anxiety. <u>See</u> Transcript at 665-669. She reported that she was under a great deal of stress as her mother had recently been diagnosed with cancer. "Anxiety as acute reaction to exceptional stress" was diagnosed. <u>See</u> Transcript at 668. It appears that she was prescribed hydroxyzine pamoate and encouraged to seek additional care.[3]

Robinson saw Bradshaw on December 5, 2015, for complaints of anxiety. <u>See</u> Transcript at 785-786. He noted her recent emergency room presentation and observed that her anxiety had grown worse with her mother's passing. He diagnosed acute grief reaction and appears to have continued her on hydroxyzine pamoate.

Robinson saw Cathey approximately fourteen months later for complaints of anxiety. <u>See</u> Transcript at 874-877 (02/28/2017). Her symptoms included chest pain, hyperventilation, palpitations, and shortness of breath and were triggered by stress. He diagnosed a generalized anxiety disorder and prescribed lorazepam.

On July 5, 2016, Robinson saw Dr. Charles R. Arkin, M.D., ("Arkin"), a rheumatologist, at Cathey's behest. <u>See</u> Transcript at 560-566, 819. An x-ray revealed mild osteoarthritis changes in Robinson's lower back, and a physical examination revealed "mild tenderness of the SI joint, discomfort with lumbar spine extension, knee joint crepitus with mobility, right ankle swelling with range of motion discomfort, pes planus bilaterally, and metatarsophalangeal tender to palpation." <u>See</u> Docket Entry 10 at CM/ECF 6 [citing Transcript at 563]. Arkin also noted pain in Robinson's weight-bearing joints. He assessed pain in multiple joints and ordered additional testing.

---

[3]     Robinson sought emergency room care approximately four months later for complaints of anxiety. <u>See</u> Transcript at 611-615. The diagnosis and treatment plan were similar to those from her November 21, 2015, emergency room presentation.

Beginning in what appears to have been sometime in 2015 and continuing through at least November of 2016, Robinson was seen for her foot impairment by Dr. Michael Haughey, D.P.M., ("Haughey"). Robinson summarized Haughey's treatment as follows:

> … Robinson's right foot condition required several surgeries. (Tr. 709-711, 721-724) First, she had a Chevron osteotomy first right metatarsal. (Tr. 721-724) After experiencing severe pain when ambulating from the hardware placed during the chevron surgery, she underwent hardware removal surgery. (Tr. 709-711)
>
> Four months after the second surgery, on July 21, 2016, Dr. Haughey gave Ms. Robinson a pain injection to treat toe cramping and pain. (Tr. 715) Dr. Haughey gave Ms. Robinson another pain injection on November 2, 2016. (Tr. 716) At that time, Dr. Haughey assessed Ms. Robinson with achilles tendinitis. (Tr. 716).
>
> On November 16, 2016, Dr. Haughey noted the previous injection did not help. Ms. Robinson was still having pain, especially in the left foot and ankle, increased with ambulation. (Tr. 718) After the previous failed surgeries, Ms. Robinson wanted to pursue conservative treatment. So, Dr. Haughey prescribed Ms. Robinson with a custom "Arizona brace" for her left foot. (Tr. 718)

See Docket Entry 10 at CM/ECF 7.

On December 28, 2016, a podiatrist completed a medical source statement-physical ("Statement") on behalf of Robinson. See Transcript at 852-854. The podiatrist identified Robinson's impairments as severe osteoarthritic and inflammatory changes of her left foot and ankle. The podiatrist opined that during a typical eight hour workday, Robinson could lift and carry less than ten pounds, could stand and walk for less than two hours, and could sit for about four hours. The podiatrist also opined that Robinson is unable to reach in any direction, has difficulty with handling and gross manipulation, and should avoid exposure to virtually all environmental stimulants. The podiatrist based the opinions on surgical inspections and radiographic examinations.

An assessment of Robinson's physical residual functional capacity was made by state agency physician Dr. William Harrison, MD, ("Harrison") on December 9, 2016, and state agency physician Dr. Clarence Ballard, M.D., ("Ballard") on February 8, 2017. See Transcript at 70-74, 100-101. Harrison and Ballard agreed that during a typical eight hour workday, Robinson could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; and stand, walk, and sit for six hours.

An assessment of Robinson's mental residual functional capacity was made by two state agency professionals, Dr. Abesie Kelly, Ph.D., ("Kelly") and Dr. Kevin Santulli, Ph.D. ("Santulli"). See Transcript at 68-70, 97-99. Kelly and Santulli agreed that Robinson's mental impairments do not impose more than mild limitations in adaptive functioning and are not severe.

The record contains a summary of Robinson's reportable earnings for the years 1985 through 2016. See Transcript at 222. The summary reflects that she worked steadily, at least between 2005 and 2011.

Robinson completed a function report in connection with her applications. See Transcript at 261-268. In the report, she represented that she cannot stand, walk, or sit for too long because of the pain in her back and knees. She can attend to her personal care, although it typically takes her longer to do so because of her pain. She can prepare simple meals and perform household and yard work, although those activities also take longer to perform because of her pain. Robinson has hobbies that include watching television and sewing. She spends time with others and participates in church activities at least twice a week. She does not use an assistive device to walk or stand.

Robinson also completed a pain report. See Transcript at 271, 273. In the report, she represented that she has pain in her back, hips, legs, and feet caused by walking, bending, squatting, sitting too long, and rising. She estimated that she can stand, walk, and sit for about ninety minutes before she begins to experience pain.

Robinson testified during the administrative hearing. See Transcript at 39-55. She was fifty-three years old at the time. She works one to two hours a day, six days a week at Life Gym doing general cleaning. She previously worked as a cook at a restaurant and for a trucking company as an over-the-road truck driver. She is unable to work because of pain in her back, knees, and ankles. Robinson takes prescription medication for pain, medication that "sometimes" helps relieve the pain. See Transcript at 45. When she is at home, she watches television and does some housework. She rehearses with a church choir on Wednesday evenings and performs with the choir on Sunday mornings. Robinson takes medication for her anxiety, and the medication "helps some." See Transcript at 51. Her church activities also help relieve her anxiety. She wears an "Arizona" brace on her left foot during the day.

The ALJ found at step two of the sequential evaluation process that Robinson's severe impairments include "other and unspecified arthropathies, disorders of the back, …, and an anxiety disorder not otherwise specified." See Transcript at 17. The ALJ assessed Robinson's residual functional capacity and found that she can perform light work with the following additional limitations:

> … [Robinson] can perform semi-skilled (SVP3 or 4) work and can perform work where interpersonal contact is routine but superficial, the complexity of tasks is learned by experience, involves several variables, uses judgment within limits, and the supervision required is little for routine, but detailed for non-routine tasks.

See Transcript at 21. In so finding, the ALJ gave no weight to the podiatrist's Statement because the signature on the Statement is illegible, and it is not clear who signed the Statement. Moreover, the ALJ observed that the podiatrist's opinions address matters outside the podiatrist's expertise, appear to be based on Robinson's self-reports, and are inconsistent with the record as a whole. The ALJ gave great weight to Harrison and Ballard's opinions because their opinions are consistent with the record as a whole. The ALJ gave only partial weight, though, to Kelly and Santulli's opinions because the opinions were offered before some of the medical evidence was produced. The ALJ found at step four that Robinson could not return to her past relevant work. At step five, the ALJ obtained the testimony of a vocational expert and found, on the basis of the testimony, that there is other work Robinson could perform.

1. DEVELOPING THE RECORD. Robinson offers a number of reasons why the ALJ's findings are not supported by substantial evidence on the record as a whole. Robinson first maintains that the record was not fully and fairly developed and offers three reasons why.

The ALJ also has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

Robinson first maintains that the ALJ erred in developing the record at step two. It is Robinson's contention that the ALJ erred by "failing to recognize any severe, foot-related impairment." See Docket Entry 10 at CM/ECF 13.

At step two, the ALJ is obligated to identify the claimant's impairments and determine if they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted].

The ALJ found at step two that Robinson's severe impairments include "other and unspecified arthropathies." See Transcript at 17.[4] The Commissioner represents, and the Court agrees, that arthropathy is a "collective term for any disease of the joints," see Docket Entry 11 at CM/ECF 8, n.5, one form of which is osteoarthritis. There is evidence in the record that Robinson's pain in her weightbearing joints is caused by osteoarthritis. Although the ALJ's finding at step two of "other and unspecified arthropathies" is certainly not a model of specificity, it can be reasonably understood to encompass Robinson's severe, foot-related impairment.

Assuming, arguendo, that the ALJ's finding at step two of "other and unspecified arthropathies" cannot be reasonably understood to encompass Robinson's severe, foot-related impairment, the ALJ's error is harmless. "[A]n error in assessing impairments as severe or non-severe at step two can be harmless when the ALJ continues the sequential evaluation and considers the functional effect of all of the claimant's impairments, even those that may have been overlooked at the second step." See Misty G. v. Berryhill, 2019 WL 1318355, 4 (D.Minn. 2019). Here, the ALJ proceeded past step two. The ALJ considered Robinson's osteoarthritis at step three and considered the impairment in assessing Robinson's residual functional capacity.

---

[4]     The "other and unspecified arthropathies" cannot be reasonably understood to encompass Robinson's back impairment because the ALJ found at step two that Robinson's severe impairments also include "disorders of the back." See Transcript at 17.

Robinson offers a second reason why the ALJ failed to fully and fairly develop the record. Robinson maintains that the ALJ erred when he discounted the podiatrist's Statement because the signature on the Statement is illegible, and it is not clear who signed the Statement. Robinson maintains that the ALJ made no attempt to determine that the Statement came from "a long-term treating specialist, who had performed multiple surgeries on … Robinson, conducted numerous physical examinations, and reviewed objective imaging." See Docket Entry 10 at CM/ECF 13.

The Court has examined the signature on the Statement, and the signature is indeed illegible. It appears to be nothing more than a bending line. It would have been an easy undertaking, though, for the ALJ to have ascertained the signatory's identity. The signatory identified themselves as a "DPM" or podiatrist, and the only podiatrist who saw Robinson was Haughey. Thus, the signatory was likely Haughey. Were an illegible signature the only reason the ALJ gave for discounting Haughey's opinions, a remand would be warranted. A remand is not warranted in this instance, though, because the ALJ gave other reasons for discounting the opinions, i.e., the opinions address matters outside Haughey's expertise, and the opinions are inconsistent with the record as a whole. As will be more fully developed below, those reasons are supported by substantial evidence on the record as a whole.

Robinson offers a third reason why the ALJ failed to fully and fairly develop the record. Robinson maintains that the ALJ formed his own medical opinions about Robinson's mental impairment because there were "no treating or examining opinions, little weight given to treating records, and partial weight given to an incomplete disability screener record review." See Docket Entry 10 at CM/ECF 15.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, "including medical records, observations of treating physicians and others, and [the] claimant's own description of [her] limitations." See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

The Court is satisfied that there was sufficient information for the ALJ to have made an informed decision as to the effects of Robinson's mental impairment. It is true that there is no medical opinion specifically addressing the effects of Robinson's impairment on her ability to work. While such an opinion would have been helpful, one was not required. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016).[5] The ALJ properly reviewed Bradshaw and Cathey's progress notes, the notes prepared during Robinson's emergency room presentations, and her own description of her limitations. The ALJ also reviewed Kelly and Santulli's opinions and could and did give the opinions some weight.[6]

---

[5] In Hensley v. Colvin, the Court of Appeals observed the following:

… "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619. However, there is no requirement that an [residual functional capacity] finding be supported by a specific medical opinion. See Myers, 721 F.3d at 526-27 (affirming RFC without medical opinion); Perks v. Astrue, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same).

… In the absence of medical opinion evidence, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011). …

See Id. at 932.

[6] Although Robinson undoubtedly experienced severe episodes of depression and anxiety, there appears to have been a situational component to her complaints as she was understandably grieving the passing of her mother.

2. ROBINSON'S FOOT PAIN. Robinson offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Robinson maintains that her complaints of foot pain were not adequately evaluated, and the ALJ erred when he found her "less-than-part-time work to be the most significant factor discrediting her allegations she could only perform less-than-part-time work." See Docket Entry 10 at CM/ECF 16.

As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, supra. The ALJ does so by determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluating the intensity, persistence, and limiting effects of the pain or other symptoms. See Social Security Ruling 16-3p.[7] In evaluating the intensity, persistence, and limiting effects of the claimant's pain or other symptoms, the ALJ must consider all the evidence, including evidence of the following:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms …; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p.

---

[7]     The Ruling eliminated the use of the word "credibility" in making disability determinations and requires the ALJ to consider several factors in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. The factors are similar to those identified in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

Substantial evidence on the record as a whole supports the ALJ's evaluation of Robinson's foot pain and the work-related limitations it causes. The Court so finds for the following reasons.

First, the ALJ properly found that Robinson has a medically determinable impairment that could reasonably be expected to produce pain. Although he identified the impairment as "other and unspecified arthropathies," his imprecise finding can be reasonably understood to encompass her severe, foot-related impairment.

Second, the ALJ adequately reviewed and evaluated the evidence relevant to the intensity, persistence, and limiting effects of Robinson's foot pain. The ALJ did so, in part, by considering the medical evidence, the bulk of which is found in Haughey's progress notes. They reflect that Robinson's right foot pain improved after surgery and the removal of hardware from her foot. When Haughey saw Robinson on November 2, 2016, he observed that her "first metatarsal right" was "asymptomatic," and she was "doing very well, very happy, very pleased." See Transcript at 716.

Robinson also complained of pain and experienced the effects of arthritis in her left foot. When Haughey saw Robinson twice during November of 2016, she reported pain, swelling, and cramping in her left ankle and foot, especially with increased ambulation. He observed, though, that her range of motion in her joints was normal, as was her muscle strength. At the November 2, 2016, presentation, he diagnosed Achilles tendinitis but did not recommend surgery. He also diagnosed posterior subtalar joint left and gave her an injection. At the November 16, 2016, Haughey assessed osteoarthritis foot and ankle pain. She asked to be treated conservatively, and he noted no limitations. The record is silent as to whether he saw her again for the impairment.

Haughey appears to have completed the Statement, a document in which he opined as to Robinson's limitations. Specifically, he opined that during a typical eight hour workday, she could lift and carry less than ten pounds, could stand and walk for less than two hours, and could sit for about four hours. The ALJ could properly give no weight to the opinions. Although one of the reasons the ALJ gave for doing so—the signature on the Statement is illegible—is suspect, the ALJ gave other reasons for discounting the opinions that are supported by substantial evidence on the record as a whole. As will be more fully developed below, the ALJ could discount the opinions because they address matters outside Haughey's expertise, and they are inconsistent with the record as a whole.

The ALJ could and did also review the assessment of Robinson's physical residual functional capacity made by Harrison and Ballard. <u>See</u> Transcript at 26. They agreed that during a typical eight hour workday, Robinson could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; and stand, walk, and sit for six hours. The ALJ could properly give their opinions some weight.

The ALJ considered Robinson's daily activities. For instance, the ALJ could and did consider that Robinson works approximately one to two hours a day, six days a week. Robinson testified that the work involves "[d]isinfecting the machines, you know, you have a spray bottle, you disinfect them, vacuuming a little bit, dusting, just general cleaning." <u>See</u> Transcript at 41. The Court is not prepared to embrace Robinson's assertion that the ALJ gave the part-time work too much weight. Her ability to work six to twelve hours a week was just one of the factors he considered in evaluating the intensity, persistence, and limiting effects of her foot pain.

The ALJ considered Robinson's receipt of unemployment benefits after the alleged onset date, finding the following:

> … after [Robinson] ceased working for her former employer on or about her alleged disability onset date, [she] filed for and collected unemployment insurance compensation through the State of Arkansas, receiving a total of $2,925 from the 3rd quarter of 2015, though the 1st quarter of 2016 (Ex. 5F). Under the eligibility requirements for unemployment benefits, an unemployed individual is only eligible to receive benefits if he or she is able and available for work. Therefore, in applying for and receiving unemployment benefits, [she] certified on a weekly basis that she was able and willing to work until the beginning of the 1st quarter of 2016. While the receipt of unemployment insurance is not disqualifying with respect to disability, asserting that she was able and willing to work as part of her receipt for unemployment benefits is not consistent with her allegations of disability (i.e. that she was unable to work) during the same period, particularly when [she] was also likely continuing to engage in part-time cleaning work activity at the Fit for Life Gym during this same period she was receiving unemployment.

See Transcript at 22. The Court is not persuaded that the ALJ gave too much weight to Robinson's receipt of unemployment benefits after the alleged onset date. Her receipt of unemployment benefits was just one of the factors he considered in evaluating the intensity, persistence, and limiting effects of her foot pain.

The ALJ also considered Robinson's use of medication and the treatment, other than medication, she received for the relief of her foot pain. For instance, she received one or more steroid injections in her foot in an attempt to alleviate the pain, but the results she obtained were not satisfactory as the benefit was short-lived. Robinson took prescription medication for her pain for a period of time but eventually elected to pursue a more conservative course of treatment by the use of over-the-counter medication. She wears an "Arizona" brace on her left foot during the day, and the brace provides some relief.

The question for the ALJ was not whether Robinson has pain caused by a foot-related impairment but the extent to which the impairment impacts the most she can do. He incorporated limitations for the impairment into the assessment of her residual functional capacity but not to the extent she believes is warranted. The ALJ could find as he did, though, because substantial evidence on the record as a whole supports his review and evaluation of all the evidence.

3. WEIGHING OF THE MEDICAL OPINIONS. Robinson offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Robinson maintains that the ALJ erred in weighing the medical opinions when he improperly discounted Haughey's opinions in the Statement and accorded too much weight to the opinions of Harrison and Ballard.

As a part of assessing the claimant's residual functional capacity, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The opinions may be discounted if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id. Whether the ALJ grants a treating physician's opinions controlling weight or little weight, "the regulations … provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)].

Substantial evidence on the record as a whole supports the ALJ's weighing of the medical opinions. Two of the reasons the ALJ gave for discounting Haughey's opinions found in the Statement are good reasons, and the ALJ did not accord improper weight to the opinions of Harrison and Ballard. The Court so finds for the following reasons.

The ALJ could and did discount Haughey's opinions because they address matters outside his expertise. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010) (opinion may be disregarded if outside of professional's expertise). Haughey is a podiatrist who saw Robinson for a foot impairment. He did not see her for an upper extremity impairment, back impairment, or respiratory impairment, and there is no indication he reviewed the evidence relevant to those impairments in formulating his opinions. Even had he reviewed that evidence, his opinions would be suspect because they involve matters outside his expertise. In short, the ALJ could reasonably disregard Haughey's opinions as to Robinson's abilities to lift and carry, sit, and be exposed to environmental stimulants.

The ALJ could and did also discount Haughey's opinions because they are inconsistent with the record as a whole, specifically, with Haughey's own progress notes. For instance, when Haughey saw Robinson on November 2, 2016, she complained of pain and swelling in her left ankle and heel. He observed, though, that her range of motion in her joints was normal, as was her muscle strength. He diagnosed Achilles tendinitis but did not recommend surgery. He also diagnosed posterior subtalar joint, left, and gave her an injection. At the November 16, 2016, presentation, Haughey assessed osteoarthritis. Robinson asked to be treated conservatively, and he noted no

limitations. Given Haughey's findings, the ALJ could reasonably find that they do not support Haughey's opinion as to Robinson's ability to stand and walk.

The ALJ could discount Haughey's opinions because they are inconsistent with the opinions of Harrison and Bullard. In assessing Robinson's physical residual functional capacity, Harrison and Bullard agreed that Robinson could, inter alia, stand and walk for six hours during a typical eight hours workday. It is true that they likely offered their opinions without the benefit of Haughey's progress notes from November of 2016, but it is possible to construe their opinions in a manner consistent with his progress notes from that month. Although Harrison and Bullard's opinions are certainly not entitled to controlling weight, the ALJ could accord the opinions some weight. There is little to suggest that the ALJ accorded too much weight to their opinions.

The ALJ could also discount Haughey's opinions because they are inconsistent with other evidence in the record. For instance, Robinson works approximately one to two hours a day, six days a week. She received unemployment benefits after the alleged onset date. Although she has used prescription medication in the past for her foot pain, she eventually elected to pursue a more conservative course of treatment for her pain. She also wears an "Arizona" brace on her left foot, which provides some relief.

4. ROBINSON'S RESIDUAL FUNCTIONAL CAPACITY. Robinson offers a fourth reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Robinson maintains that her residual functional capacity was erroneously assessed in the following two respects:

> … Nonexertionally, the ALJ found severely limiting anxiety and no severe depression. Despite the severe anxiety finding, the ALJ found a mental RFC that parrots the definition of semi-skilled work with routine, but

> superficial interpersonal contact … This finding incorporates no real anxiety-related limitations. This finding is also internally inconsistent.
>
> …
>
> Exertionally, the ALJ found … Robinson could perform a full range of light work. To perform a full range of "light work," a claimant must be able to stand or walk for six hours of an eight-hour work day. … Beyond the limitation to light exertional weight bearing, the ALJ found no limitation in reaching, handling, fingering, walking, standing, climbing, bending, stooping, or persistent physical exertion. These findings are not supported by the record.

<u>See</u> Docket Entry 10 at CM/ECF 22.

The assessment of a claimant's residual functional capacity is not simply a "laundry list of impairments and limitations." <u>See</u> <u>Gann v. Colvin</u>, 92 F.Supp.3d 857, 884 (W.D.Iowa 2015). Rather, it is an explanation of what the claimant can and cannot do despite her limitations. When making the assessment, the ALJ "looks at all the evidence in the record to 'determine more precisely how, if at all, the claimant's impairments limit her ability to work.'" <u>See Mary G. v. Berryhill</u>, 2019 WL 1130173, 2 (D.Minn. 2019) [quoting <u>Taylor v. Astrue</u>, 2012 WL 294532, 8 (D.Md. 2012)].

Substantial evidence on the record as a whole supports the crafting of Robinson's residual functional capacity. The ALJ could and did craft it without a depression-related limitation and only a minimal anxiety-related limitation because the evidence of the work-related limitations caused by those impairments is not compelling. Bradshaw and Cathey's progress notes, the notes prepared during Robinson's emergency room presentations, her own description of her limitations, and Kelly and Santulli's opinions indicate that the impairments do not give rise to meaningful work-related limitations. Moreover, the evidence indicates that her difficulties had a significant situational component. She understandably experienced much stress and grief as a result of her

mother's cancer diagnosis and subsequent passing. See Haggett v. Colvin, 2014 WL 107847 (E.D.Mo. 2014) (situational factors not a basis for an award of benefits).

The ALJ could and did also craft Robinson's residual functional capacity so as to limit her to a full range of light work. There is little evidence that she has a meaningful limitation in reaching, handling, and fingering, and he could properly find that her back impairment, while severe, does not give rise to significant work-related limitations. Without question, she has some limitations standing and walking, but he could reasonably find that limiting her to light work adequately accounted for the limitations caused by her foot-related impairment.

5. THE HYPOTHETICAL QUESTION. Robinson offers a fifth reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Robinson maintains that the ALJ committed error at step five in the following respects:

> … The ALJ did not ask the [vocational expert] a single vocational hypothetical to address … Robinson's limitations in walking or standing. There was no testimony regarding a stand/sit option for light work or any breaks from standing and walking.
>
> The ALJ also provided an internally inconsistent, and unsupported, nonexertional hypothetical. There is no vocational evidence in this record regarding … Robinson's ability to perform jobs with truly "incidental" interpersonal contact.
>
> Further, the ALJ clearly relied on non-treating, non-examining screeners to produce the vocational hypothetical. …

See Docket Entry 10 at CM/ECF 23-24.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v.

Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). Thus, the question must include all of the claimant's impairments that are substantially supported by the record as a whole.

A vocational expert testified during the administrative hearing, see Transcript at 55-59, during which he was asked a series of hypothetical questions. In one question, the vocational expert was asked to assume an individual of Robinson's age, education, and work experience who could perform light, semi-skilled work. The work performed would be limited to personal contact, routine but superficial. The complexity of tasks would be learned by experience and would involve several variables, the use of judgment within limits, and the supervision required would be liberal for routine but detailed for non-routine. The vocational expert testified that "utiliz[ing] earlier mentioned transferrable work skills," see Transcript at 57, the individual could perform work as a chauffeur and cashier II. The ALJ credited the testimony and found that there are jobs Robinson could perform.

The ALJ did not err in crafting the hypothetical question or in relying upon the vocational expert's answer. The question captured the concrete consequences of Robinson's limitations and was adequately phrased. It is true that the question did not incorporate a sit/stand option or breaks from walking and standing, but the ALJ did not err in failing to incorporate those limitations into the question. Substantial evidence on the record as a whole supports the ALJ's determination that Robinson can stand and walk for up to six hours in an eight hour workday. Although she experiences foot pain, his characterization of the evidence relevant to her impairment and the limitations it causes was a reasonable characterization of the evidence.

Given the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Robinson's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 12th day of August, 2019.

_____

UNITED STATES MAGISTRATE JUDGE